## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **PATRICIA GRANDSTAFF,** | ) | |
| 9334 W. 48th Terrace | ) | |
| Merriam, KS 66203, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| **PROJECT BELLE LLC,** | ) | **JURY TRIAL DEMANDED** |
| (Serve Registered Agent: | ) | |
| $49 Registered Agent Services, Inc., | ) | |
| 5740 Osage Beach Parkway, Suite 1005 | ) | |
| P.O. Box 1120 | ) | |
| Osage Beach, MO 65065), | ) | |
| | ) | |
| Defendant. | ) | |

## **COMPLAINT**

Plaintiff Patricia Grandstaff states the following as her causes of action against Defendant Project Belle LLC.

1. Plaintiff Patricia Grandstaff (Plaintiff) is a female resident of Merriam, Johnson County, Kansas.

2. Defendant Project Belle LLC (Defendant) is a limited liability company that conducts business in the State of Kansas.

3. Defendant is an employer as defined and within the meaning of 42 U.S.C. § 12111(5) of the Americans with Disabilities Act Amendments Act of 2008 (ADAAA).

4. Plaintiff is bringing these claims pursuant to the ADAAA, 42 U.S.C. § 12101, et. seq.

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1332.

6.      Venue is proper because a substantial part of the events or omissions giving rise to these claims occurred in the District of Kansas within the meaning of 28 U.S.C. § 1391(b).

7.      Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission alleging that Defendant engaged in the discriminatory and retaliatory actions that are being raised in this lawsuit, or alternatively, the allegations of Plaintiff's lawsuit would have arisen from the investigation of Plaintiff's Charge of Discrimination.

8.      A Notice of Right to Sue has been issued by the Equal Employment Opportunity Commission and this action is being brought within ninety (90) days from the issuance of such Notice of Right to Sue.

9.      Plaintiff has fulfilled all conditions precedent to the bringing of this claim and has duly exhausted all administrative procedures in accordance with the law prior to instituting this lawsuit.

### ALLEGATIONS COMMON TO ALL COUNTS

10.      Plaintiff started working for Defendant on February 20, 2023, as a Mobile Nail Technician.

11.      Defendant provides therapeutic foot care services (services) to Medicare recipients in their homes.

12.      Defendant refers to the individuals who receive services as "members."

13.      Defendant's services to its members include an assessment; a foot cleanse and scrub; the trimming, filing and buffing of toenails; a foot and leg massage; dry floss; and the optional application of nail polish.

14.     Plaintiff initially interviewed with Jessica White (White), Defendant's Regional Manager, but shortly after Plaintiff was hired, White left the company and Heather Wasikowski (Wasikowski), Defendant's Operations Manager, took over White's duties.

15.     White had told Plaintiff that she would only be assigned to travel to locations within five miles of her house, but that did not turn out to be accurate, as Defendant scheduled Plaintiff to travel to cities in both Kansas and Missouri, including to homes that were as far as 40 minutes from her home.

16.     Defendant did not schedule Plaintiff to work at homes near one another, rather Plaintiff might be scheduled to work in Kansas City, Kansas, then Olathe or Overland Park, Kansas, and then back to Kansas City, Kansas.

17.     Defendant only paid Plaintiff $10/day to cover any travel expenses, which did not even cover Plaintiff's fuel costs.

18.     Defendant allowed employees one and one-half hours for each appointment, including drive time.

19.     Defendant did not make scheduling adjustments based on the distance between appointments.

20.     Additionally, Defendant automatically deducted an hour each day from Plaintiff's paycheck for lunch, despite the fact that Plaintiff rarely had the opportunity to take a lunch break due to her appointments running long and/or the distance she had to drive between appointments.

21.     Defendant issued a cellular telephone to Plaintiff for work, and Plaintiff was required to use the work application (app) on that telephone.

22. When Plaintiff entered each home, she had a list of health-related questions to ask each member.

23. Defendant estimated the initial questions to take eight to ten minutes for each visit.

24. There was no way to skip a question and return to it while members searched for calendars and other documents to answer questions, so the questions often took a lot longer for members to answer than the time frame allocated by Defendant.

25. After servicing members' feet, Plaintiff had another set of questions to ask them about their activities and doctors' visits.

26. Because gathering the answers from members to these questions took longer than estimated and since Plaintiff had to record the answers provided, Plaintiff's appointments often took longer than scheduled.

27. Some of the members Plaintiff worked with could not move themselves into position without assistance so Plaintiff had to lift up their legs or assist them in moving their bodies into place before she could work on their feet.

28. Neither Wasikowski nor White disclosed that Plaintiff would need to move people during her interviews or training.

29. Many of Defendant's members were living in unsanitary conditions, and Plaintiff had to provide her services on dirty floors, including floors that were littered with old food and/or animal feces and urine.

30. If Plaintiff saw that a member was living in unsanitary conditions or saw signs of abuse or depression, she was required to report it to her supervisor.

4

31.    When Plaintiff reported unsanitary conditions, one of Defendant's employees would call the member after Plaintiff reported them so the member would know that Plaintiff made the report.

32.    Despite Plaintiff carrying a cellular telephone issued to her by Defendant, Defendant often contacted Plaintiff on her personal cellular telephone after she arrived at a member's home and would then ask Plaintiff to hand her personal telephone to the member so Defendant could directly speak to the member.

33.    Mobile Nail Technicians were not provided with adequate training by Defendant on how to identify certain skin and medical conditions.

34.    Plaintiff came into contact with fungus, suspected methicillin-resistant Staphylococcus aureus (MRSA), and skin conditions that she could not identify.

35.    Plaintiff was not provided with enough information on preventative measures that she could take to protect her lungs from such conditions.

36.    The masks that Defendant provided did not fit well and were open on the sides, allowing germs and dust particles inside.

37.    Defendant had no concern for Plaintiff's safety and scheduled appointments for Plaintiff in high crime areas.

38.    One member lived across the street from a site where police officers had recently been shot while responding to drug-related activity, and the member told Plaintiff not to leave anything visible in her car because Plaintiff was wearing scrubs and looked like Plaintiff might have medical supplies.

39.    Plaintiff could see people watching her on the street and out of windows nearby.

5

40.    Plaintiff asked Wasikowski not to schedule her there anymore and Wasikowski told Plaintiff she would see what she could do.

41.    Plaintiff could see on Defendant's app that there were other technicians who lived nearby who could have been assigned to that member, but Defendant continued to schedule Plaintiff at that location.

42.    Plaintiff was also sent to the home of a member who had anger problems.

43.    When this member answered his door, he was furious that Plaintiff was not his usual technician and slammed the door in Plaintiff's face.

44.    Plaintiff started to walk to her car, and the member opened the door again and started reaching for something inside.

45.    Plaintiff got into her car and saw a note in this member's file that he only wanted a specific technician, and that his sister needed to be present due to his anger issues.

46.    Plaintiff suffers from Sjogren's Syndrome, an autoimmune disease and sometimes suffers flare ups that cause her to experience chronic fatigue, swelling, headaches, sensitivity to light, and muscle and joint pain.

47.    Stress can cause Plaintiff's Sjogren's Syndrome to flare up.

48.    Plaintiff needs to take her medications for Sjogren's Syndrome at the same time every day to prevent fluctuation in her treatment and some of Plaintiff's medications also cause her gastrointestinal issues if she does not take the medications with food.

49.    When Plaintiff did not have a lunch break, it was difficult to take her medications for Sjogren's Syndrome at the same time every day or sometimes at all.

50.     Plaintiff also suffers from a blood disorder in which her red blood cells do not carry/transport oxygen properly causing her chronic fatigue.

51.     Plaintiff requires blood infusions at the cancer center every three months to treat this blood condition.

52.     The stress Plaintiff was experiencing at work, including, but not limited to, the strenuous act of moving people into position, the long drives between appointments without the ability to take a break, the stress of working in unsanitary conditions, concerns for her safety, and/or her inability to take medication at lunch at the same time resulted in flare ups of her Sjogren's Syndrome, and Plaintiff started to suffer from fatigue and felt like her energy was depleted.

53.     In approximately April 2023, Plaintiff called Wasikowski to inform her that she had autoimmune issues and needed to take her medication at the same time every day.

54.     Plaintiff requested a one-hour lunch break with no appointments.

55.     Wasikowski replied that Plaintiff would lose an hour of pay if Plaintiff took the lunch break.

56.     Plaintiff told Wosikowski that she was already having an hour deducted for lunch.

57.     Wosikowski informed Plaintiff that it would take thirty days for Defendant to implement the change requested.

58.     Wosikowski said she would notify Plaintiff when she implemented change, but she did not.

59.     Plaintiff and Wosikowski also discussed this subject through text messages.

60.    In approximately the end of April or early May 2023, Hannah Jackson (Jackson) became the Kansas Regional Manager and Plaintiff's supervisor.

61.    On May 5, 2023, Plaintiff sent text messages to Jackson stating that she was not feeling well that morning and that she was going to take some medicine and go back to sleep.

62.    On May 8, 2023, Plaintiff sent a text message to Jackson stating:

I'm still not feeling well, Ive [sic] got an appointment tomorrow morning. Please reschedule my 9am. I'm going to try to work the 12pm after I finish with my appointment.

63.    On May 9, 2023, Jackson sent Plaintiff a text message asking what her plan was for the day.

64.    Plaintiff responded that she was still not feeling well, but she was going to try to work that day.

65.    Jackson asked if Plaintiff saw her doctor.

66.    Plaintiff replied, "Yes, I'm having an autoimmune flare up. It should calm down in a few days with an antibiotic and the immune suppressant medication."

67.    Jackson wrote that it sounded miserable, and Plaintiff replied:

Thank you for checking in with me. I wish I could say it's not miserable. Overall, I enjoy visiting with the members, it's just hard to be at my best for them when I'm like this and my system gets depleted easy.

68.    On May 11, 2023, Plaintiff sent another text message to Jackson stating that she had talked to Wasikowski about blocking out the 1:30 p.m. time slot so Plaintiff could eat and recharge.

69.     Plaintiff also told Jackson that she understood that she would not be paid since she was not available during that time, even though Defendant was already deducting an hour from Plaintiff's paychecks for a lunch break that she was often unable to take.

70.     Jackson said she would take a look and make sure it was set up correctly.

71.     On May 12, 2023, Jackson sent Plaintiff a text message stating:

Hey Patricia, I spoke with Heather, looks like a formal schedule change hadn't been fully confirmed last time you spoke. I can certainly take care of this, however we do require a 30 day notice for schedule changes. That all being said, this change will go into effect on June 14th and the unavailable time will be unpaid. I just want to confirm with you this is what you'd like me to do?"

Plaintiff replied:

I understand there's a 30 day notice but my body and health isn't cooperating, with what I'm pushing it to do at the moment. A set time to eat and take my medication, which sometimes makes me very nauseous was a solution so that I can continue to serve the members and take care of myself. For the most part this job is rewarding in the way that it feels like I'm serving a purpose that helps people but it can also be very exhausting. Without getting in depth with my health, I've got underlining issues I need to stay ahead of. Doing my job well is important to me and I've got to create a work life balance.

72.     On May 15, 2023, Jackson sent Plaintiff a text message stating that the earliest she could make the change around Plaintiff's 1:30 p.m. slot would be June 8, 2023.

73.     Jackson stated that she could not move any more appointments unless Plaintiff wanted to go through the Americans with Disabilities Act (ADA) accommodation process with Priscilla Encarnacion (Encarnacion), Director of Human Resources/Legal.

74.     Jackson told Plaintiff that Encarnacion would need Plaintiff's doctor to fill out forms in order to provide an immediate accommodation.

75.     Plaintiff replied that she wanted to go ahead with the June 8, 2023, deadline and also start the process with Encarnacion since she was not currently feeling well.

76.     Encarnacion scheduled a meeting with Plaintiff on May 17, 2023.

77.     On May 17, 2023, Encarnacion was not at the meeting.

78.     Plaintiff sent Encarnacion a text message asking if the meeting was canceled.

79.     Encarnacion replied that she was in another meeting with a vendor, and she asked if they could reschedule.

80.     On May 17, 2023, or May 18, 2023, Plaintiff had a telephone call with Encarnacion.

81.     During Plaintiff and Ecarnacion's call, Plaintiff told Encarnacion that she has Sjogren's Syndrome and a blood disorder.

82.     Plaintiff explained to Encarnacion that Sjogren's Syndrome flare ups cause her to suffer from fatigue, joint pain, muscle pain, and swelling, and that she was feeling run down and fatigued.

83.     Plaintiff also told Encarnacion that she needed to take her medication at the same time every day.

84.     Plaintiff also explained to Encarnacion that her red blood cells do not transport oxygen properly, causing her chronic fatigue, and that she needed blood infusions at the cancer center every quarter.

85.     On May 17, 2023 or May 18, 2023, Encarnacion sent Plaintiff Family and Medical Leave Act (FMLA) paperwork for her doctor to complete.

86.     Encarnacion told Plaintiff to contact her about how to return the documents and any questions Plaintiff had.

87.    Encarnacion did not provide a fax number where Plaintiff's doctor could submit the paperwork.

88.    Plaintiff sent Encarnacion a message asking where to send the documents when complete, but Encarnacion did not respond.

89.    Defendant did not provide Plaintiff with any ADA paperwork.

90.    On June 1, 2023, Plaintiff sent a text message to Jackson stating:

Good morning Hannah,
I'm not feeling well and need to call off today. Yesterday I had an appointment with my primary care doctor, she's working with my rheumatologist and hematologist to coordinate what I may be able to take to calm my system down.

91.    Jackson replied that Plaintiff would get three attendance points for contacting her only an hour before her first appointment and told Plaintiff to give her more than two hours in the future.

92.    Plaintiff replied, "Ok, I'll know for next time. My doctor is also filling out the Fmla paperwork that HR gave me."

93.    On June 4, 2023, Jackson started to deduct two hours from Plaintiff's daily pay for lunch.

94.    On June 7, 2023, Plaintiff sent another text message to Jackson stating:

I'm going to be working today and try to see how my system reacts. The paperwork for HR is ready at my doctors office. I'll be able to pick it up on Monday. Please look at my schedule for tomorrow. There's 2 appointments scheduled which are located 25 minutes apart.

96.    Jackson replied that she would look at Plaintiff's schedule, but she never got back to Plaintiff.

96.    On June 9, 2023, Plaintiff was very ill.

11

97.     Plaintiff's kidneys had not worked in 24 hours.

98.     Plaintiff's body was swollen, and she could not open her eyes or get up out of bed.

99.     Plaintiff told Jackson via text message that working the day before had depleted the little bit of energy that she had.

100.    Jackson asked if Plaintiff planned to work that day and asked if Plaintiff had time for a call.

101.    Jackson then sent Plaintiff a Google+ Hangout invite for a video call.

102.    When Plaintiff accepted the call, Jackson asked Plaintiff what good was she to the company if she was sick.

103.    Jackson also said that if Plaintiff was not well enough to do the job, she was going to have to let Plaintiff go and that Plaintiff's illness was affecting the members and other workers.

104.    Jackson then asked what Plaintiff was planning on doing about it.

105.    That afternoon, on June 9, 2023, Jackson sent Plaintiff a text message asking if she could meet with Encarnacion and her.

106.    Plaintiff told Jackson that she had not moved from the spot she was in when they spoke that morning, Plaintiff seriously did not feel well, and the light on her screen was hurting her head.

107.    After all of the negative things Jackson said to Plaintiff during the meeting that morning, Jackson replied, "Ok, I'm sorry you're feeling that way."

108.    Jackson's tone was different when she communicated with Plaintiff in writing versus how she communicated with Plaintiff verbally.

109.    On June 12, 2023, Plaintiff sent a text message to Encarnacion requesting a fax number to submit her FMLA paperwork.

110.    Encarnacion did not respond to Plaintiff with instructions or a fax number.

111.    The same day, on June 12, 2023, Jackson sent Plaintiff a text message on Plaintiff's day off to request another meeting.

112.    Plaintiff told Jackson she was at the hospital and asked for a fax number for her doctor to fax the FMLA paperwork.

113.    Jackson said she would check with Human Resources for the best number.

114.    Jackson then again asked Plaintiff if they could schedule a call, and Plaintiff told Jackson she thought she would be done at the hospital shortly.

115.    Jackson replied asking Plaintiff to send her a message so they could have a call.

116.    At 4:31 p.m., Plaintiff told Jackson she was leaving the hospital, and Jackson said she was busy and asked if they could have their call at 4:00 p.m. the next day.

117.    Jackson also proceeded to ask if Plaintiff planned to work her shift the next day.

118.    Plaintiff wrote to Jackson that she was planning to work, but had two appointments starting at 3:00 p.m. followed by a 26-minute drive back home from the appointment.

119.    Plaintiff told Jackson she would try to call her earlier in the day.

120.    On June 13, 2023, Jackson sent Plaintiff a text message asking Plaintiff to call her after her last appointment and scheduled a video call at 4:00 p.m.

121.    At 4:48 p.m., Plaintiff was still at her appointment and Jackson told Plaintiff to call her as soon as she was finished and found a safe place to park.

13

122. As soon as Plaintiff clocked out of her appointment around 4:50 p.m., before she found a safe place to park, Jackson called Plaintiff again.

123. Plaintiff answered and said she was looking for a safe place to pull over.

124. Jackson then told Plaintiff she was fired, and Jackson then handed off the call to Encarnacion to finish the termination process.

125. Encarnacion said they were not aware that Plaintiff had a chronic illness when she was hired.

126. Plaintiff said she did not think it was legal to fire someone because of health conditions.

127. Encarnacion said that does not apply to them (meaning Defendant) and the decision had already been made.

128. Job performance and bonuses were determined by three criteria: 1) being on time to appointments; 2) rebooking members for future appointments; and the quality of the data/notes that employees took during the appointments.

129. When Plaintiff logged in to Defendant's app each day, she could see her performance scores.

130. Plaintiff's scores were 100% at the time of her termination.

131. Plaintiff also received several five-star reviews from members through Defendant's app.

132. One gentleman who had previously been treated by a different technician also told Plaintiff that his leg condition did not start improving until Plaintiff started working with him.

133.    Until Plaintiff started to experience flare ups due to her disability, her attendance was good.

134.    Defendant has a bonus structure that gives $5.00 to Mobile Nail Technicians for each service if they are on time to the appointment, rebook a member for an appointment, and take good clinical notes.

135.    Plaintiff only received one bonus check of approximately $200 during the period of her employment with Defendant.

136.    Plaintiff believes Defendant owed her approximately an additional $200 at the time of her termination, but Defendant did not include the remaining bonuses in Plaintiff's final paycheck.

137.    Defendant also failed to pay Plaintiff the $400 hiring bonus that it listed in its employment advertisement on Indeed.com.

138.    Shortly after Plaintiff started working for Defendant, Plaintiff asked Wasikowski when she would receive the hiring bonus.

139.    Wasikowski said that because the bonus was not included in Plaintiff's offer letter, Defendant would not pay it.

## COUNT I – DISABILITY DISCRIMINATION IN VIOLATION OF THE ADAAA

141.    Plaintiff hereby incorporates by reference into Count I all allegations contained in all preceding paragraphs herein against Defendant.

142.    Plaintiff suffered from a disability/physical impairment, i.e. Sjogren's Syndrome and a blood disorder, which substantially limited one or more of Plaintiff's major life activities and/or bodily functions, including, but not limited to, caring for oneself, eating, sleeping, standing,

lifting, bending, breathing, concentrating, thinking, working, immune system function, normal cell growth, digestive system function, bowel and bladder functions, neurological function, respiratory function, circulatory function, endocrine function, and reproductive system function within the meaning of the ADAAA, 42 U.S.C. § 12101, *et seq*.

143. In addition, or in the alternative, Defendants perceived or regarded Plaintiff as suffering from a disability/physical impairment within the meaning of the ADAAA, 42 U.S.C. § 12101, *et seq*.

144. In addition, or in the alternative, Plaintiff had a record of a disability/physical impairment, i.e. Sjogren's Syndrome and a blood disorder, which substantially limited one or more of Plaintiff's major life activities and/or bodily functions, including, but not limited to, caring for oneself, eating, sleeping, standing, lifting, bending, breathing, concentrating, thinking, working, immune system function, normal cell growth, digestive system function, bowel and bladder functions, neurological function, respiratory function, circulatory function, endocrine function, and reproductive system function within the meaning of the ADAAA, 42 U.S.C. § 12101, *et seq*.

145. Plaintiff was able to perform the essential functions of her position with or without reasonable accommodation.

146. Defendant failed and/or refused to provide any reasonable accommodation to Plaintiff, including failing to accommodate Plaintiff by allowing her to take regular lunch breaks, to take her prescribed medication at a set time each day, and/or to take additional time off due to her disabilities/physical impairments.

147. Defendant discriminated against Plaintiff by terminating her employment because Plaintiff suffered from a disability/physical impairment, i.e. Sjogren's Syndrome and a blood

16

disorder, which substantially limited one or more of Plaintiff's major life activities, because Defendant perceived and/or regarded Plaintiff as suffering from a physical or mental impairment, and/or because Plaintiff had a record of a disability/physical impairment, i.e. Sjogren's Syndrome and a blood disorder, which substantially limited one or more of Plaintiff's major life activities.

148.    Defendant's actions, as alleged herein, constitute a violation or violations of the ADAAA, 42 U.S.C. § 12101, et seq., including 42 U.S.C. § 12102(3)(A), and its accompanying regulations.

149.    All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

150.    As a direct and proximate result of the unlawful conduct of Defendant as set forth herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and future lost wages and benefits, a detrimental job record, career damage and diminished career potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

151.    The conduct of Defendant was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

152.    Plaintiff is entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendant for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred

17

herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## COUNT II – RETALIATION IN VIOLATION OF THE ADAAA

153.    Plaintiff hereby incorporates by reference into Count II all allegations contained in all preceding paragraphs herein against Defendant.

154.    Plaintiff engaged in protected activity by, including without limitation, asserting her rights under the ADAAA, including reporting that Defendant was not accommodating her disability.

155.    As a result of Plaintiff asserting her rights under the ADAAA, including reporting that Defendant was not accommodating her disability, Defendant retaliated against Plaintiff and caused her to suffer adverse employment actions, including, but not limited to, terminating her employment in violation of 42 U.S.C. § 12203(a).

156.    All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

157.    As a direct and proximate result of the unlawful conduct of Defendant as set forth herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and future lost wages and benefits, a detrimental job record, career damage and diminished career potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

158.    The conduct of Defendant was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

159.    Plaintiff is entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendant for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all Counts and all allegations contained herein.

## REQUEST FOR PLACE OF TRIAL

Plaintiff hereby requests that the trial of this matter take place in Kansas City, Kansas.

Respectfully submitted,

**EMPLOYEE & LABOR LAW GROUP
OF KANSAS CITY, LLC**

By:    /s/Kristi L. Kingston
        Kristi L. Kingston, KS Bar No. 19126
        12920 Metcalf Avenue, Suite 180
        P.O. Box 25843
        Overland Park, KS 66225
        Ph:    (913) 286-5200
        Fax:   (913) 286-5201
        Email: kristi@elgkc.com

**ATTORNEY FOR PLAINTIFF**